FILED
2022 Mar-11  AM 08:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| SHAWN DEFOE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | |
| vs. ) | _____ |
| ) | |
| C.C.S. GARBAGE SERVICE, INC., ) | |
| ) | |
| Defendant. | |

_____

## COMPLAINT

### I. JURISDICTION

1. This is a suit for relief from violation of the anti-retaliation provision of the False Claims Act, 31 U.S.C. §3730(h). The jurisdiction of this Court is based on 28 U.S.C. §1331.

### II. PARTIES

2. Plaintiff Shawn Defoe ("Plaintiff") is a citizen of the United States over the age of nineteen and a resident of Athens, Limestone County, Alabama.

3. Defendant C.C.S. Garbage Service, Inc. ("Defendant") is an Alabama corporation with a principal place of business in Athens, Limestone County, Alabama.

## III. <u>FACTS</u>

4.  Defendant provides garbage collection services for Limestone County, Alabama.

5.  In or abut 2015, Plaintiff became employed by Defendant.

6.  Plaintiff worked as a "slinger" on the back of a garbage truck.

7.  After the Covid pandemic hit in early 2020, none of Defendant's employees were laid off and services continued as usual.

8.  There were about 29 employees working for the company, including a few work release inmates, and 9-10 trucks.

9.  Each truck was supposed to have one driver and two slingers, though most often some trucks only had one slinger.

10.  In or about September of 2020, Plaintiff asked Gatlin for some personal protection equipment (gloves and a face mask) for Covid.

11.  Gatlin told Plaintiff that his lawyer had told him that he only had to provide employees with a safety vest.

12.  Gatlin terminated Plaintiff on his next work day, stating only that his services were no longer needed.

13.  A couple of months later, Plaintiff asked Gatlin for his job back.

14. Gatlin agreed as long as Plaintiff did not say anything about personal protection equipment.

15. Plaintiff agreed to that and was rehired.

16. In the Fall of 2021, Plaintiff heard that Defendant had gotten funding from the federal Paycheck Protection Program ("PPP").

17. Plaintiff and his co-workers discussed having learned that employees working at other places had gotten bonuses with PPP money their employers obtained but that they had received none.

18. In late December of 2021 or early January of 2022, Plaintiff learned how to search on the internet for information regarding Defendant's receipt of PPP money.

19. Plaintiff found that Defendant had received $224,000 in April of 2020 for purposes of "payroll," and that it represented in its application that the funds were to preserve 37 jobs.

20. Plaintiff had doubts that the money was actually used for payroll.

21. First, there had been no cessation of services, so as far as Plaintiff knew Defendant was still getting paid its normal rate from Limestone County.

22. Second, Plaintiff did not believe that Defendant actually had 37 employees.

23. Finally, Plaintiff knew that Defendant had bought three new trucks and a new fuel tank and pump since receiving the PPP money.

24. After learning of the details of the company's PPP money, Plaintiff believed that Defendant was misusing it.

25. Plaintiff told people at work about it and that he was going to report his belief to the federal government.

26. On or about January 4, 2022, Plaintiff made a post on FaceBook showing the information about the PPP money Defendant received, as well as the income portion of Plaintiff's 2019 W-2.

27. Plaintiff stated in the post that the numbers did not add up and stated that something was "going on" with Defendant's use of the PPP money.

28. It is presently unknown if Gatlin was aware of Plaintiff's FaceBook post before Plaintiff was terminated.

29. However, Gatlin had been told directly by a co-worker earlier on January 4, 2022 that Plaintiff was going to "turn" Defendant "in" over "the PPP money."

30. On or about January 5, 2022, Gatlin's son Stuart met Plaintiff at his truck when he arrived at work.

31. Stuart Gatlin also worked for Defendant as assistant to Gatlin.

32. Stuart Gatlin told Plaintiff that his "services were no longer needed."

## IV. CAUSES OF ACTION

## COUNT I

## RETALIATORY DISCHARGE- FALSE CLAIMS ACT

33. Paragraphs 1-32 above are incorporated by reference.

34. As set forth above, Plaintiff communicated his belief to co-workers and on social media that Defendant had been misusing federal PPP funds and that he intended to report it to the federal government.

35. Prior to Plaintiff's termination, Defendant was aware of Plaintiff's intention to report Defendant's believed misuse of federal PPP funds to the government.

36. Plaintiff's communicated belief addressed above and his intention to report it to the federal government constituted lawful acts done by Plaintiff to stop one or more violations of the False Claims Act.

37. Further, Plaintiff's communicated belief that Defendant had been misusing federal PPP funds and that he intended to report it to the federal government support a reasonable conclusion that Defendant could have feared being reported to the government for fraud or sued in a *qui tam* action by Plaintiff.

38. Plaintiff had a reasonable, good-faith belief that Defendant was misusing federal PPP funds.

39. Plaintiff's communicated belief addressed above and his intention to report it to the federal government constituted protected activity under the False Claims Act.

40. Defendant terminated Plaintiff in retaliation for his having engaged in protected activity under the False Claims Act.

41. As a result of Defendant's violation of the False Claims Act, Plaintiff has been made to suffer lost wages and benefits, as well as emotional distress and mental anguish.

**WHEREFORE, these premises considered,** Plaintiff respectfully requests the following:

(i) That the Court issue an Order declaring that Defendant's acts as described herein violated the False Claims Act;

(ii) That the Court enter an Order requiring Defendant to make Plaintiff whole by reinstating his employment and placing him in the position he would have occupied in the absence of the violation of his rights (or, alternatively, front pay), ordering Defendant to pay Plaintiff two times the amount of lost back pay with interest, and ordering Defendant to pay Plaintiff compensatory and special damages as a jury may assess;

(iii) That the Court grant Plaintiff a permanent injunction enjoining Defendant, and its agents, employees, successors, and those acting in concert with Defendant from continuing to violate the False Claims Act;

(iv) That the Court award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law and an amount to compensate him for any adverse tax consequences as a result of a judgment in his favor; and

(v) That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

Respectfully submitted,

s/ Adam M. Porter
Adam M. Porter
Attorney for Plaintiff
Adam M. Porter, LLC
2301 Morris Avenue, Suite 102
Birmingham, Alabama 35203
Phone: (205) 322-8999
Facsimile: (205) 402-4619
Email: adam@adamporterlaw.com

Plaintiff requests trial by struck jury.

s/ Adam M. Porter
Attorney for Plaintiff